**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH SCHMIDT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-1517 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF NAPERVILLE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Sarah Schmidt, a firefighter and paramedic, took unpaid leave during her pregnancies. Under the collective bargaining agreement, the Naperville Fire Department should not have counted her unpaid leave when it calculated her seniority. Unpaid leave lasting more than 30 days doesn't count.

But the Naperville Fire Department mistakenly included Schmidt's unpaid leave when it calculated her seniority. Years later, the fire department caught the mistake and made a correction, reducing her seniority by 112 days. The fire department included the correct amount when it published the annual seniority list in 2020, and in 2021.

In September 2022, the fire department published its annual seniority list and expressly flagged that correction. The note explained that the fire department had reduced Schmidt's seniority in 2020 because she could not accrue seniority during unpaid absences.

For whatever reason, no one from the fire department reached out to Schmidt directly and drew her attention to the correction. And for whatever reason, Schmidt did not notice the

correction in the 2020 seniority list, or the 2021 seniority list, or the 2022 seniority list. Schmidt didn't realize that the fire department had reduced her seniority until June 2023.

Schmidt responded by filing a charge of discrimination with the EEOC, and later filed a complaint in federal court. She alleges that the fire department discriminated against her on the basis of sex. After discovery, Naperville moved for summary judgment, arguing that the claim was untimely.

For the following reasons, Defendant's motion for summary judgment is granted.

**Background**

Sarah Schmidt has served the public as a firefighter and paramedic for almost two decades. She joined the Naperville Fire Department in 2008. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 28-1). She has committed her professional life to helping people who need it most.

Schmidt has decades of seniority, and seniority comes with perks. Firefighters and paramedics bid on shifts, vacation days, and fire station assignments based on their seniority. *Id.* at ¶¶ 29, 31–32; *see also* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 8 (Dckt. No. 29); Schmidt Dep. Tr., at 8:20 – 9:3 (Dckt. No. 26-1).

Seniority makes a difference in the promotion process, too. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 28-1). It accounts for 10% of the Department's promotion analysis. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 29).

The collective bargaining agreement governs how to calculate seniority. Under the CBA, an employee does not accrue seniority during any period of unpaid leave lasting longer than 30 consecutive days. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 5 (Dckt. No. 28-1). "Seniority shall not accrue during any period of time when the employee is in a non-paid status

for thirty (30) or more consecutive days, such as a suspension or unpaid leave of absence, except as otherwise provided by law." *See* CBA, at § 8.1 (Dckt. No. 26-2)

If an employee takes unpaid leave for over 30 days, then the Department should reduce his or her seniority when that employee returns to work. *See* Smith Decl., at ¶ 14 (Dckt. No. 26-3).

The CBA also requires Naperville to post a seniority list before each contract year. The list gives a ranking of each of the employees by seniority. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 28-1); *see also* CBA, at § 8.5 (Dckt. No. 26-2). That way, the employees know where they stand in line.

Division Chief Daniel Smith is responsible for updating the seniority list. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 28-1). Every September, Smith posts the new seniority list for the upcoming calendar year. *Id.* at ¶ 35. For example, in September 2024, Smith posted the 2025 seniority list.

Smith publishes the seniority list on Naperville's SharePoint website as an Excel spreadsheet. *Id.* Employees can access the seniority list by navigating the SharePoint website themselves or by asking a secretary to pull it up. *See* Schmidt Dep. Tr., at 20:6-9 (Dockt No. 26-1).

The list is available to the employees, but the fire department does not send the list directly to the employees, either. Employees do not receive an email or other notification when Smith publishes the seniority list. *Id.* at 19:21 – 20:5.

Even so, the publication of the list does take place at the same time as the sweepstakes for vacation time. Every year, the fire department sends an official notice that bidding on the upcoming year's vacation days has begun. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36

(Dckt. No. 28-1). The notice about the selection of vacation days takes place at the same time as the publication of the seniority list. *Id*.; *see also* Smith Decl., at ¶ 9 (Dckt. No. 26-3). And the seniority list is the basis for the pecking order when it comes to picking vacation time.

Schmidt participated in the bidding process for vacation days. *See* Schmidt Dep. Tr., at 19:14-20 (Dckt. No. 26-1). She knew that the bidding depended on seniority. *Id.* She also knew about the seniority list, and knew how to access it. *Id.* at 19:14 – 21:14. In fact, Schmidt has accessed the list at various times over her career. *Id.* at 20:10-17.

During her tenure, Schmidt took two pregnancy-related periods of unpaid leave lasting longer than 30 days. In 2012, Schmidt was pregnant and took unpaid leave from November 30, 2012, to January 13, 2013. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 20 (Dckt. No. 28-1). In 2014, Schmidt had another child, taking unpaid leave from June 8 to August 24, 2014. *Id.* at ¶ 22.

So, Schmidt took unpaid leave twice, and each absence lasted longer than 30 consecutive days. She took unpaid leave for a total of 112 days. Under the CBA, Schmidt was not entitled to seniority credit for that period of time. *See* CBA, at § 8.1 (Dckt. No. 26-2).

The fire department should have reduced her seniority credit by 112 days when she returned from leave. But it didn't. The fire department gave her credit for the full period of her unpaid leave, and didn't catch it at the time. The mistake stayed on the books for years.

The fire department figured out the mistake years later, in 2020. Smith learned that Schmidt had received seniority credit during her two periods of unpaid leave. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 43 (Dckt. No. 28-1).

4

The record doesn't reveal how Smith got wind of the mistake. But Smith decided to look into it. Smith reached out to Stephanie Gianetto in the human resources department and obtained Schmidt's pay records. *Id.* at ¶ 44.

The pay records confirmed the need for a correction. Smith calculated that Schmidt had taken two separate unpaid absences lasting over 30 consecutive days, totaling 112 days. *Id.* at ¶¶ 45–46. But the fire department had mistakenly counted those days when calculating her seniority.

In 2020, Smith corrected the mistake and reduced Schmidt's seniority by 112 days. *Id.* at ¶ 47. The change went into effect for the 2021 seniority list. *Id.*

The reduction did not violate the CBA. Quite the opposite – the CBA *required* the reduction. The parties agree that the reduction in seniority was "in accordance with Article 8.1 of the CBA." *Id.*

A reduction by 112 days may not seem like a long time. But it was long enough to affect her standing vis-à-vis other employees. The reduction affected Schmidt's place on the totem pole.

With 112 fewer days of seniority, Schmidt lost ground to another employee. A male employee jumped ahead of her. The reduction moved Schmidt down one rung on the seniority ladder. *Id.* at ¶ 48.

The 2021 seniority list reflected Schmidt's lower seniority level. *Id.* at ¶ 47. But it didn't call attention to the reduction, either. The 2021 seniority list did not include any notation to highlight that Schmidt had less seniority than previously thought.

Apart from publishing an accurate list, the fire department did not notify Schmidt about the change. That is, the fire department did not send her an email, or a letter, or any other official

notice that it had reduced her seniority by 112 days. The fire department didn't flag the correction, apart from publishing an accurate 2021 seniority list.

The fire department published the seniority list in 2022, too (as it does every year). The 2022 seniority list included an accurate calculation. But like the 2021 seniority list, the 2022 seniority list did not call attention to the fact that the fire department had reduced Schmidt's seniority a year earlier.

On September 22, 2022, Smith published the 2023 seniority list. For the first time, Smith added a notation that called attention to the reduction in Schmidt's seniority.

"Schmidt seniorty [sic] reduced by 112 days. 2 [leave of absences] 11/12 & 6/14." *Id.* at ¶¶ 41–42. The numbers at the end reflected the months and years when Schmidt took leave, meaning November 2012 and June 2014.

As always, the fire department published the 2023 seniority list contemporaneously with the notice that bidding had begun on vacation days for the upcoming year. *Id.* at ¶ 40.

Schmidt did not notice the change to her seniority when Naperville published the seniority list for 2021, or 2022, or 2023. In fact, Schmidt didn't realize that Naperville had reduced her seniority until June 2023, nearly eight months after the publication of the 2023 seniority list in September 2022. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 29).

Schmidt believes that the reduction in seniority constitutes sex discrimination. On November 8, 2023, Schmidt filed a charge of discrimination with the EEOC. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 55 (Dckt. No. 28-1). A few weeks later, the EEOC issued Schmidt a right to sue letter. *Id.* at ¶ 57.

6

On February 23, 2024, Schmidt sued the Naperville Fire Department, alleging sex discrimination under Title VII. *See* Cplt. (Dckt. No. 1). Schmidt later filed an amended complaint and substituted the City of Naperville as the defendant. *See* Am. Cplt. (Dckt. No. 6).

After discovery, Naperville moved for summary judgment.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party*.*" *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

Naperville seeks summary judgment on two grounds.  First, Naperville argues that Schmidt cannot bring a Title VII claim because she failed to exhaust the grievance process under the CBA.  Second, Naperville contends that the claim is untimely.

## I.      The Grievance Process

Naperville begins with the argument that Schmidt jumped the gun.  As Naperville sees things, Schmidt needed to seek a remedy through the grievance process before running to the federal courthouse.

Typically, a collective bargaining agreement does not prevent an employee from bringing a Title VII claim in federal court.  *See Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426 (7th Cir. 2021).  But if a collective bargaining agreement expressly covers antidiscrimination claims, then the grievance procedure becomes the exclusive remedy available to covered employees.  *See Adams v. Hostess Brands, LLC*, 2022 WL 3026935, at *2–4 (N.D. Ill. 2022); *see also Vega v. New Forest Home Cemetery, LLC*, 856 F.3d 1130, 1134 (7th Cir. 2017).  An express waiver can lead to an exclusive remedy.

Losing the ability to go to the federal courthouse is no small thing.  So the bar is high for a grievance procedure to preempt antidiscrimination claims.

For grievance procedures to be the exclusive remedy, "an agreement to arbitrate statutory antidiscrimination claims [must] be 'explicitly stated' in the collective bargaining agreement." *See 14 Penn Plaza v. Pyett*, 556 U.S. 247, 258 (2009).  "The Supreme Court alternatively described this 'explicitly stated' requirement as demanding a 'clear and unmistakable' waiver." *Cloutier*, 996 F.3d at 434 (citation omitted).

Basically, a collective bargaining agreement must name names, and expressly mention discrimination claims. That is, a collective bargaining agreement must expressly say that the grievance process is the exclusive remedy for discrimination claims. Otherwise, the employee does not lose the right to enter the federal courthouse.

"It is neither unattainable nor unreasonable to expect parties to a collective bargaining agreement to clearly state those statutory claims that they intend to confine to arbitration." *Id.* at 437. The case law "underscores just how high the 'clear and unmistakable' bar is." *Id.* at 439.

For example, the CBA in *Cloutier* required arbitration of "dispute[s] between the parties arising under the terms of this Agreement." *Id.* at 437. The Seventh Circuit held that the CBA did not explicitly, clearly, or unmistakably cover an employee's Family Medical Leave Act claims. *Id.* So, the employee could go to federal court to vindicate his statutory rights.

That's the case here, too. Naperville and Schmidt's CBA contains an "exclusivity" provision. *See* CBA, at § 9.8 (Dckt. No. 26-2). That clause says that the "grievance procedure set forth in this Article shall be the sole and exclusive means for discussing and processing items subject to the grievance procedure." *Id.*

But the CBA defines a "grievance" as a "complaint arising under this Agreement" that alleges a "violation, misinterpretation or misapplication of a specific provision of this Agreement." *Id.* at 4 of 8. There is no mention of discrimination claims.

The parties have not provided the entire CBA to the Court. But none of the provisions in the record refer to any federal statutory right. No provision refers to state or federal antidiscrimination laws. In fact, no provision even mentions discrimination.

The collective bargaining agreement closely mirrors the one in *Cloutier*. Both CBAs covered disputes "arising under" the "Agreement." But that language does not explicitly, clearly,

9

or unmistakably communicate to an employee that they "had undoubtedly waived their right to pursue statutory claims outside of" the CBA's grievance process. *See Cloutier*, 996. F.3d at 439.

The bar for waiver is high, and this CBA does not clear it. So, the CBA does not prevent Schmidt from bringing a Title VII claim in federal court.

## II. The Statute of Limitations

Next, Naperville argues that Schmidt's discrimination claim is untimely. Naperville believes that she raised the issue with the EEOC months (or years) too late.

"Failure to timely file an administrative charge is an affirmative defense, and the burden of proof at summary judgment therefore rests on the defendant." *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009).

Applying the statute of limitations in a discrimination case requires a few steps. The statute creates the baseline rule. And courts have grafted a few doctrines onto the rule, too.

As a starting point, the statute requires an employee to bring a charge to the EEOC "within three hundred days after the alleged unlawful employment practice occurred." *See* 42 U.S.C. § 2000e-5(e)(1).

The key moment is when the unlawful act "occurred." *Id.* The statute itself does not mention notice to the employee. It does not say anything about when the employee learned about the unlawful act, or when the employee realized that he or she had suffered an injury. The timing of the "unlawful employment practice" is what counts (as a starting point, anyway, before considering judicially-created exceptions).

"Title VII provides that a charge of employment discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice, in deferral states like Illinois." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014); *Adams v. City*

*of Indianapolis*, 742 F.3d 720, 729–30 (7th Cir. 2014) ("A Title VII plaintiff normally must first file a charge with the EEOC within a specified period of time after the challenged employment action occurs. . . . The limitations period in Title VII begins to run when 'the alleged unlawful employment practice occurred.'") (quoting the statute); *Moore v. Vital Products, Inc.*, 641 F.3d 253, 256 (7th Cir. 2011) ("To bring a Title VII claim, a plaintiff must file an EEOC charge within 300 days of the conduct underlying the claim."); *see also Brown v. United Airlines, Inc.*, 2015 WL 5173646, at *1 (N.D. Ill. 2015) ("A plaintiff in Illinois who wishes to bring a Title VII claim in federal court must first file an administrative charge with the EEOC within 300 days of the alleged unlawful employment practice.").[1]

So, in general, an employee can sue for discriminatory acts occurring within 300 days of the EEOC charge. An employee is out of luck if he or she wants to bring a claim about anything bad that happened more than 300 days before going to the EEOC (again, unless exceptions apply – stay tuned).

Before applying that rule here, this Court needs to take a little detour down a side road in the case law.

At one point, the Seventh Circuit wrote a sentence that might suggest a different rule. *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004). In *Stepney*, the Seventh Circuit noted that the "300-day limitations period commences 'at the time the

---

[1] Many courts outside the Seventh Circuit have held that the Title VII clock begins when the discriminatory decision occurs, not when that decision is communicated to the employee. *See, e.g.*, *Nelson Tennessee Coll. of Applied Tech.*, 2023 WL 3294710, at *2 (6th Cir. 2023) ("Pursuant to the statutory language of Title VII, the applicable statute of limitations begins to run from the date of the alleged unlawful employment practice.") (cleaned up); *Dawson v. Delta Air Lines, Inc.*, 2018 WL 5316004, at *4 (E.D. Va. 2018) ("Moreover, the Fourth Circuit . . . has held that the statute of limitations under Title VII begins to run when the act occurred, not from the time of discovery.") (citing *Hamilton v. 1st Source Bank*, 928 F.2d 86, 87–88 (4th Cir. 1990)); *Williams v. Westchester Med. Ctr. Health Network*, 2025 WL 903757, at *9 (S.D.N.Y. 2025) ("For purposes of Title VII, the statute of limitations begins to run when each discrete discriminatory or retaliatory act occurs.") (cleaned up) (collecting cases).

employment decision was made *and communicated to the employee*.'" *Id.* at 240 (citation omitted) (emphasis added).

At first glance, that sentence might change what it takes to start the clock ticking. It suggests that communicating the decision to the employee is a necessary step for the 300-day period to begin. It might give the impression that the clock doesn't start ticking until the bad act happens *and* the employer communicates it to the employee.

The Seventh Circuit relied on the Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980). In *Ricks*, the Supreme Court confronted a claim by a professor who lost his job. In June 1974, the college notified the professor that he was not getting tenure, and the college terminated him in June 1975. The Supreme Court held that the statute of limitations started running when the professor knew about the decision (in June 1974), even though the termination did not happen until later (in June 1975).

*Ricks* involved the opposite situation than the one involving Schmidt. In *Ricks*, the employee got notice first, and lost his job later. But in the case at hand, Schmidt lost seniority first, and found out about it later. So *Ricks* involved notice and then a bad act, and Schmidt's case involves an alleged bad act and then notice.

The Seventh Circuit in *Stepney* cited *Ricks* as the basis for a so-called "notice rule." "Under the notice rule, the 300–day limitations period commences 'at the time the [employment decision] was made and communicated to [the employee].'" *Id* at 240 (brackets in original) (citing *Ricks*). That stray sentence, read in isolation, could take on a life of its own.

*Stepney* involved a different situation than *Ricks* – it is more akin to the case brought by Schmidt. In *Stepney*, the bad acts happened in August 1999 and May 2000, and the employee did not receive notice about them until May 2000. But the employee waited until January 10,

2002 to bring an EEOC charge. He waited too long, because an EEOC claim on January 10, 2002 could not support a claim about conduct before May 10, 2001 (*i.e.,* 300 days earlier).

This Court does not read *Stepney* to stand for the proposition that the clock begins when the employer communicates the decision to the employee, as opposed to when the bad act occurred. That issue was not presented to the Seventh Circuit, for a simple reason: either way, the employee waited too long. And in any event, the "notice rule" seems to bleed into the discovery rule, which is one of the exceptions discussed below.

It seems cleaner to apply a simple rule, and then apply the exceptions (including the discovery rule), instead of tinkering with the baseline rule itself. After all, Congress makes the rules, and courts must apply the statutory text as written. Courts sometimes recognize judicially-created exceptions, but the rule itself comes from the language of the statute.

The statute at hand creates a straightforward rule. An employee needs to bring a claim to the EEOC within 300 days of when the "unlawful employment practice occurred." *See* 42 U.S.C. § 2000e-5(e)(1). Otherwise, the claim is sunk, unless an exception applies.

Turning back to the main road, Schmidt did not bring a claim to the EEOC by the deadline in the statute. The fire department changed her seniority status in September 2020, but she waited until November 2023 to file a charge with the EEOC. That's much longer than 300 days.

That conclusion is not the end of the road. A few other doctrines come into play. At first blush, the statute's baseline rule might seem harsh in certain cases, but that's why courts have recognized exceptions.

The first doctrine is the discovery rule. "The discovery rule postpones the beginning of the limitations period to the date when the plaintiff discovers *or should have discovered* that

13

[she] has been injured." *Smith v. Union Pac. R. Co.*, 474 F. App'x 478, 480 (7th Cir. 2012) (emphasis added); *see also Anael v. Interstate Brands Corp.*, 2002 WL 31109451, at *4 (N.D. Ill. 2002) ("Moreover, under the federal discovery rule, the filing period begins to run when the plaintiff 'knew or *should have known* about his injury.'") (quoting *Ferguson v. Roberts*, 11 F.3d 696, 704–05 (7th Cir. 1993)) (emphasis in original).

A plaintiff "does not benefit from the rule [when] reasonable diligence would have revealed the injury." *See O'Malley v. Kass Mgmt. Servs., Inc.*, 539 F. Supp. 3d 935, 940 (N.D. Ill. 2021) (Chang, J.) (citing *Cathedral of Joy Baptist Church v. Vill. of Hazel Crest*, 22 F.3d 713, 717 (7th Cir. 1994)).

The discovery rule cannot save Schmidt's untimely claim. Schmidt had three years to notice the reduction in her seniority. The fire department did not hide the fact that it had reduced her seniority. If the decision was hiding, it was hiding in plain sight.

In September 2020, the fire department published the seniority list for 2021. That seniority list included the reduction of Schmidt's seniority by 112 days. One year later, the fire department published the seniority list for 2022, and once again included up-to-date information for her seniority status.

True, the 2021 and 2022 seniority lists did not call attention to the change in her seniority status. But the fire department shined a light on the change in September 2022, when it issued the seniority list for 2023.

The 2023 seniority list included a comment that explained Schmidt's seniority reduction. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 41 (Dckt. No. 28-1). The 2023 seniority list expressly stated that the fire department had reduced her seniority based on leave periods in 2012

14

and 2014. "Schmidt seniorty [sic] reduced by 112 days. 2 [leave of absences] 11/12 & 6/14."

*Id.*

The fire department did not include that comment in a hidden document in the bowels of the department. Instead, it flagged the reduction in the annual report about seniority, for all of the employees to see. Smith published the seniority list on SharePoint, and the fire department contemporaneously notified employees that bidding on vacation days had begun. *Id.* at ¶¶ 40–42.

Schmidt was no stranger to the seniority list. Schmidt knew how to access the seniority list. *See* Schmidt Dep. Tr., at 19:21 – 20:5 (Dckt. No. 26-1). Schmidt participated in the bidding process for vacation days, and she knew that the bidding depended on seniority. *Id.* at 19:14-20. She accessed the seniority list at other times during her career. *Id.* at 20:10-17. She relied on the seniority list because it created the pecking order for perks like vacation days.

Based on this record, no reasonable jury could save this untimely claim based on the discovery rule. Schmidt should have known about the reduction in her seniority no later than September 2022 (if not before), when the fire department issued the 2023 seniority list. Schmidt had at her fingertips everything that she needed to know to bring a claim, but she waited until November 2023 to go to the EEOC.

The second doctrine is equitable tolling. Equitable tolling differs from the discovery rule. The discovery rule changes when the statute of limitations clock begins to run, while equitable tolling stops the clock from running. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1991); *see also Joiner v. Illinois Dep't of Hum. Servs.*, 2014 WL 5032564, at *2 (N.D. Ill. 2014).

15

The Seventh Circuit limits the application of equitable tolling in discrimination cases. Equitable tolling can apply when a plaintiff lacks information or makes a good-faith mistake, or when a defendant stands in the way of bringing a claim:

> In discrimination cases equitable tolling extends filing deadlines in only three circumstances: when a plaintiff exercising due diligence cannot within the statutory period obtain the information necessary to realize that she has a claim; when a plaintiff makes a good-faith error such as timely filing in the wrong court; or when the defendant prevents a plaintiff from filing within the statutory period.

*See Porter v. New Age Servs. Corp.*, 463 F. App'x 582, 584 (7th Cir. 2012) (citations omitted).

This case does not involve a good-faith error. It is not as if Schmidt accidentally complained to the SEC instead of the EEOC. This case does not involve any interference by the fire department, either. No one prevented her from pursuing a claim.

The only other possible hook for equitable tolling is a lack of information by the employee, despite due diligence. That's not an easy showing. A court "may only extend the deadline" if, "despite all due diligence," the employee could not "obtain the information necessary to realize that [she] may possibly have a claim." *See Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (cleaned up).

Once again, Schmidt comes up short, for the reasons already covered. On this record, no reasonable jury could conclude that Schmidt exercised "all due diligence." She had the seniority lists in her hands every year, and those lists showed a reduction in her seniority. But she didn't pursue it.

The third doctrine is the exception for continuing violations. "Under the 'continuing violation' doctrine, a Title VII plaintiff may recover for otherwise time-barred conduct that is

part of a single, ongoing unlawful employment practice if at least one related act occurs during the limitations period." *Barrett v. Illinois Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015).

The continuing violation doctrine does not apply to "discrete discriminatory acts." *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002); *see also Jones*, 613 F.3d at 669–70; *Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chicago*, 2012 WL 1802148, at *6 (N.D. Ill. 2012) (Feinerman, J.).

An employee's loss of seniority qualifies as a "discrete act," which means that the continuing violation doctrine does not apply to Schmidt's claim. *See Stepney*, 392 F.3d at 240 n.1; *see also Flowers v. City of Chicago*, 2019 WL 1932587, at *3 (N.D. Ill. 2019).

The bottom line is that Schmidt slept on her rights. The statute required her to bring a claim to the EEOC within 300 days of the alleged discriminatory act. She neglected to do so. Court have recognized a few exceptions, but none of them can save the day.[2]

### Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted.

Date: March 10, 2026

_____
Steven C. Seeger
United States District Judge

---

[2] In fact, in her brief, Schmidt does not expressly discuss the discovery rule, equitable tolling, or the continuing violation doctrine. So, any arguments are arguably waived. Even so, this Court went ahead and addressed the doctrines anyway.